IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 25-cv-1847-WJM-KAS

ABBVIE, INC., *et al.*,

      Plaintiffs,

v.

PHILIP WEISER, *et al.*,

      Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

---

Defendants Plaintiffs AbbVie, Inc., Allergan, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "Plaintiffs" or "AbbVie") bring this lawsuit against Defendants Philip Weiser, in his official capacity as Attorney General of the State of Colorado; and Kristen Wolf, Ryan Leyland, Patricia Evacko, Avani Soni, Michael Scruggs, Alexandra Zuccarelli, and Jayant Patel, in their official capacities as members of the Colorado State Board of Pharmacy (collectively, "Defendants"), to challenge the constitutionality of Colorado Senate Bill 25-071, now codified as the Colorado 340B Contract Pharmacy Protection Act, Colorado Revised Statutes (C.R.S.) §§ 6-29-101 *et seq.* (2025) (the "Act").[1]  (ECF No. 43 (the "FAC").)

---

[1] The Act went into effect on August 6, 2025.  (*See* ECF No. 33-1 at 9.)

Now before the Court is Defendants' Motion to Dismiss Pursuant to Rule Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ("Motion").  (ECF No. 81.)  AbbVie filed a response (ECF No. 109), to which Defendants filed a reply (ECF No. 127).

For the reasons set forth below, the Motion is granted.

## I.    BACKGROUND[2]

The Court incorporates by reference the factual background and procedural history set forth in its October 31, 2025 Order Denying Plaintiffs' Motion for a Preliminary Injunction ("PI Order").  (ECF No. 115.)

There have been limited developments in this case since the PI Order.  AbbVie timely appealed the PI Order in November 2025, (ECF No. 123), and its appeal remains pending before the Tenth Circuit.  *See AbbVie, et al. v. Weiser, et al.,* COA Docket # 25-1439 (10th Cir.).  Meanwhile, Magistrate Judge Kathryn A. Starnella stayed discovery in this action pending resolution of the Motion.  (ECF Nos. 121, 124.)

Beyond the instant proceedings, district courts across the country have continued to consider issues and claims similar or identical to those addressed in the PI Order and the Motion.  Most notably, two other judges in this District have likewise denied pharmaceutical manufacturers' requests for a preliminary injunction enjoining enforcement of SB25-71.  *See PhRMA v. Weiser,* 2026 WL 763970, at *3 (D. Colo. Mar. 18, 2026); *AstraZeneca Pharms. LP v. Weiser,* 2025 WL 3653161, at *5 (D. Colo. Dec. 17, 2025).

---

[2] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.  In addition, unless otherwise defined herein, capitalized terms in this Order shall have the same meaning ascribed to them in the PI Order.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by the Constitution and statute." *Gunn v. Minton,* 568 U.S. 251, 256 (2013) (internal quotation marks omitted). Rule 12(b)(1) thus empowers a court to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case but instead calls for a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS,* 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). "The party invoking a federal court's jurisdiction bears the burden of establishing subject-matter jurisdiction." *Caballero v. Fuerzas Armadas Revolucionarias de Colombia,* 945 F.3d 1270, 1273 (10th Cir. 2019). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Safe Streets All. v. Hickenlooper,* 859 F.3d 865, 878 (10th Cir. 2017) (brackets and internal quotation marks omitted). A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler,* 442 F.2d 674, 677 (10th Cir. 1971).

### B.    Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a party may move for dismissal if the complaint fails "to state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).

"This pleading standard does not impose a probability requirement but demands 'more than a sheer possibility that a defendant has acted unlawfully.'" *Brown v. City of Tulsa,* 124 F.4th 1251, 1263 (10th Cir. 2025) (quoting *Ashcroft,* 550 U.S. at 570). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. "Although the court must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor, the plaintiff still 'must nudge the claim across the line from conceivable or speculative to plausible.'" *Brown,* 124 F.4th at 1263 (quoting *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021)).

The Tenth Circuit has emphasized that "[g]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.,* 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Dias v. City & Cnty. of Denver,* 567 F.3d 1169, 1178 (10th Cir. 2009)) (second alteration in original). It accordingly "impose[s] a low bar of surviving a motion to dismiss,' and a 'well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Brown,* 124 F.4th at 1264 (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs,* 973 F.3d 1022, 1034 (10th Cir. 2020)).

### III.     RULE 12(B)(1) MOTION

Defendants argue that the Court lacks subject-matter jurisdiction over AbbVie's claims because AbbVie has failed to allege facts sufficient to establish it has standing. (ECF No. 81 at 7.)  The Court considers AbbVie's standing to assert each of its three claims below.  *See Bronson v. Swensen,* 500 F.3d 1099, 1106 (10th Cir. 2007) (Where multiple plaintiffs and claims are involved, "[e]ach plaintiff must have standing to seek each form of relief in each claim.").

1.     AbbVie's First and Third Claims for Relief

AbbVie's first and third claims seek declaratory and injunctive relief on the grounds that the Act is preempted by Section 340B and violates the Takings Clause. (ECF No. 43 at ¶¶ 142–65, 174–84.)

"Federal courts do not wield plenary jurisdiction over every slight or suit."  *Hydro Resources, Inc. v. EPA,* 608 F.3d 1131, 1144 (10th Cir. 2010) (en banc).  "The Constitution gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'"  *California v. Texas,* 593 U.S. 659, 668 (2021) (quoting U.S. Const. Art. III, § 2).  "That power includes the requirement that litigants have standing."  *California,* 593 U.S. at 668.  To have standing, a plaintiff must establish three things: (1) they suffered an "injury in fact"—"an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is likely the injury will be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted). Courts "refer to these three familiar requirements as injury in fact, causation, and

redressability." *Habecker v. Town of Estes Park, Colo.,* 518 F.3d 1217, 1224 (10th Cir. 2008).

Defendants do not appear to contest that AbbVie has met the first standing requirement of an "injury in fact." *Lujan,* 504 U.S. at 560–61. But they argue, "to the extent AbbVie has suffered an injury-in-fact, AbbVie has not sufficiently alleged—nor can it allege—that such injury is fairly traceable to SB25-71 or that a favorable decision would remedy the injury." (ECF No. 81 at 8.)

The Court disagrees. Two other judges in this District have now considered and rejected substantially the same argument raised by Defendants. Specifically, in *AstraZeneca Pharmaceuticals LP v. Weiser,* Judge Philip A. Brimmer reasoned a pharmaceutical manufacturer's allegation that "S.B. 71 makes participation in Section 340B more costly through its requirement to make Section 340B discounted drugs available at unlimited contract pharmacies" was sufficient to demonstrate "a 'concrete and particularized' injury that is fairly traceable to S.B. 71." 2025 WL 3653161, at *5 (citation omitted). Judge Regina M. Rodriguez adopted similar reasoning. *See PhRMA v. Weiser,* 2026 WL 763970, at *3 (D. Colo. Mar. 18, 2026) ("While SB[25]-[71] does not impact the price of Section 340B drugs, it does affect the overall cost of PhRMA's participation in Section 340[B]. This economic injury is sufficiently 'concrete and particularized' and 'fairly traceable' to SB[25]-[71] to establish standing." (citation omitted)).

Similarly here, AbbVie alleges that its costs of compliance "with state laws like Colorado's is substantial." (ECF No. 43 at ¶ 137.) It estimates that "complying with similar state laws in Mississippi and Missouri last year cost AbbVie around $33.1 million

6

and $35 million, respectively," and expects "[c]omplying with Colorado's law will [similarly] cost AbbVie tens of millions of dollars per year (if not more)." (*Id.*) Like Judge Brimmer and Judge Rodriguez, the Court finds these allegations sufficient to establish a "concrete and particularized" economic injury that is "fairly traceable" to SB25-71 with respect to AbbVie's first and third claims for relief. *Lujan,* 504 U.S. at 560–61.

       2.      <u>Second Claim for Relief</u>

AbbVie's second claim likewise asserts a Supremacy Clause violation, but its preemption arguments are predicated on the alleged conflict between the Act and HRSA's Pilot Rebate Program, rather than Section 340B. (ECF No. 43 at ¶¶ 166–73.)

"[S]tanding is determined at the time the action is brought, and [courts] generally look to when the complaint was first filed, not to subsequent events." *Mink v. Suthers,* 482 F.3d 1244, 1253–54 (10th Cir. 2007) (citation omitted). That is so "even if the complaint is later amended," *Grace Bible Fellowship v. Polis,* 694 F. Supp. 3d 1338, 1347 (D. Colo. 2023) (citing *S. Utah Wilderness Alliance v. Palma,* 707 F.3d 1143, 1153 (10th Cir. 2013)), though a court must "examine 'the amended complaint in assessing a plaintiff's claims, including the allegations in support of standing.'" *Palma,* 707 F.3d at 1152–53 (quoting *Mink,* 482 F.3d at 1254).

AbbVie lacked standing to challenge the constitutionality of the Act based on any alleged conflict between the state law and the Pilot Program when it filed this lawsuit in 2025. (ECF No. 1.) At that time, the Pilot Program had not yet begun. 90 Fed. Reg. 36163, 36164 (Aug. 1, 2025) (specifying a January 1, 2026 effective date). Indeed, the regulatory comment period had not yet even closed, (90 Fed. Reg. at 36163 (setting September 2, 2025 deadline for comments)), and AbbVie had not yet even applied to

participate in the Pilot Program, (ECF No. 43 at ¶ 169).  Thus, AbbVie's "allegations of

possibly future injury are not sufficient" to establish standing.  *Clapper v. Amnesty Int'l*

*USA,* 568 U.S. 398, 409 (2013).  Neither can the fact that AbbVie has since applied for

and been approved to participate in the Pilot Program conjure standing post hoc where

none existed at the time of filing the original complaint.  (ECF No. 112.)

Accordingly, AbbVie's second claim for relief, asserting preemption of the Act

based on the Pilot Program, is dismissed without prejudice for lack of standing.  *See*

*Brereton v. Bountiful City Corp.,* 434 F.3d 1213, 1219 (10th Cir. 2006) (Under Rule

12(b)(1), "[a] jurisdictional defect calls for a dismissal without prejudice.").

## IV.    RULE 12(B)(6) MOTION

Defendants additionally move to dismiss each of AbbVie's claims for failure to

state a claim upon which relief can be granted.  For substantially the same reasons set

forth in the PI Order, the Court agrees that AbbVie's first and third claims asserting

violations of the Supremacy Clause and Takings Clause should be dismissed.[3]

## B.    Supremacy Clause Violation

AbbVie's first claim alleges that the Act is impliedly preempted by Section 340B

under the doctrines of field preemption and conflict preemption.  (ECF No. 43 at

¶¶ 142–165.)

As set forth in the PI Order, "any preemption inquiry begins with the presumption

that federal law does not override 'the historic police powers of the States,' without the

---

[3] Given the Court's conclusion above that AbbVie lacks standing to assert a conflict preemption based on the Pilot Program, it does not further analyze the merits of AbbVie's second claim for relief in this section.

'clear and manifest' intent of Congress." *Bradshaw v. Am. Airlines, Inc.,* 123 F.4th 1168, 1173 (10th Cir. 2024) (quoting *Arizona v. United States,* 567 U.S. 387, 400 (2012)). Moreover, the "assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Altria Grp., Inc. v. Good,* 555 U.S. 70, 77 (2008) (citation omitted), "applies with greater force when the alleged conflict is in an area traditionally occupied by the States," *Ramsey Winch Inc. v. Henry,* 555 F.3d 1199, 1204 (10th Cir. 2009).

Courts have repeatedly found that laws like the Act implicate "traditional general areas of state regulation," like "public health," *AbbVie, Inc. v. Fitch,* 152 F.4th 635, 647 (5th Cir. 2025) (citing *Gobeille v. Lib. Mut. Ins. Co.,* 577 U.S. 312, 325 (2016) (noting "the State's traditional power to regulate in the area of public health")), and "the practice of pharmacy," *PhRMA v. McClain,* 95 F.4th 1136, 1143 (8th Cir. 2024) (citation omitted). *See also AbbVie, Inc. v. Murrill,* 166 F.4th 528, 539 (5th Cir. 2026) (reaffirming that presumption against preemption attached to comparable Lousiana law because "[i]t regulates the distribution of drugs to patients and the role of pharmacies in this distribution—areas left free under the 340B Program for state supplementation"). As the party claiming preemption, AbbVie "bears the burden of showing with specificity that Congress intended to preempt state law." *Day v. SkyWest Airlines,* 45 F.4th 1181, 1184 (10th Cir. 2022) (internal citation and quotation marks omitted).

With these principles in mind, the Court considers AbbVie's conflict and field preemption theories separately below.

1.      Conflict Preemption

"[A] state law provision will be preempted if it conflicts with federal law, either because (1) 'compliance with both federal and state regulations is a physical impossibility,'" "or because the provision (2) 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of' federal law." *United States v. Supreme Court of New Mexico,* 839 F.3d 888, 918 (10th Cir. 2016) (quoting *Arizona,* 567 U.S. at 399).

AbbVie invokes only the second type of conflict preemption in alleging that "Colorado's S.B. 71 conflicts with or otherwise obstructs Congress's 340B program in multiple ways."  (ECF No. 43 at ¶ 152.)

a.      *Enforcement Scheme*

First, AbbVie argues that "S.B. 71 clashes with Congress's aim to create an exclusive federal enforcement scheme."  (ECF No. 109 at 16.)  In the FAC, AbbVie alleges that the Act "installs a parallel enforcement regime, granting enforcement authority to state officials and even private citizens" to investigate and redress violations of SB25-71 through the Colorado Consumer Protection Act ("CCPA").  (ECF No. 43 at ¶ 160.)  AbbVie avers that, in this way, "S.B. 71 purports to grant substantive authority to Colorado state officials over the 340B program's administration and enforcement, despite and in conflict with the comprehensive compliance and enforcement regime Congress provided and made exclusive."  (*Id.*)

As discussed in the PI Order, "'[c]onflict is imminent' when 'two separate remedies are brought to bear *on the same activity*.'"  *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373 (2000) (quoting *Wis. Dep't of Indus. v. Gould, Inc.,* 475 U.S.

10

282, 286 (1986)) (emphasis added); *see also Arizona,* 567 U.S. at 402 ("Permitting the State to impose its own penalties for the *federal offenses* here would conflict with the careful framework Congress adopted." (emphasis added)).  AbbVie has not plausibly alleged facts demonstrating that is the case here.  Rather, as Defendants explain, "[a]ny questions about alleged diversion or compliance with federal pricing compliance are matters for federal enforcement," (ECF No. 81 at 17 (citing 42 U.S.C. §§ 256b(d)(2)(B)(v), (d)(3); 42 C.F.R. §§ 10.20–10.25)), while the Act "prohibits 'pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements,'" (*id.* (quoting *McClain,* 95 F.4th at 1145)).  Those are distinct activities.

Faced with similar conflict preemption challenges by pharmaceutical manufacturers, two Circuit Courts of Appeal have affirmed summary judgment for the state defendants on substantially the same grounds.  *See Murrill,* 166 F.4th at 541 (concluding "there is no overlap in the enforcement Venn Diagram—and thus no conflict"—between Louisiana law and Section 340B); *McClain,* 95 F.4th 1136, 1144 (8th Cir. 2024) (concluding state agency and "HHS ha[ve] jurisdiction over different disputes").  Several district courts have followed the same line of reasoning in dismissing manufacturers' preemption claims predicated on allegedly conflicting federal and state enforcement schemes at the Rule 12 stage.  *See PhRMA v. Skrmetti,* 2026 WL 803261, at *13 (M.D. Tenn. Mar. 23, 2026) (rejecting manufacturer's argument that Tennessee's law "attempts to 'supplant the exclusive federal enforcement regime'" and concluding, to the contrary, that "the state enforcement scheme does not overlap [with] the federal scheme"); *AbbVie Inc. v. Skrmetti,* 2026 WL 542712, at *11 (M.D. Tenn.

Feb. 26, 2026) (dismissing AbbVie's preemption claim predicated on an alleged conflict in enforcement schemes upon concluding "the state statute does not set up a parallel enforcement scheme; it provides only for the enforcement of the Tennessee law"); *PhRMA v. Bailey,* 2025 WL 644281, at *2–*3 (W.D. Mo. Feb. 27, 2025) (concluding Missouri's law poses "no obstacle to the enforcement of the 340B program" because it "does not set or enforce discount pricing but protects covered entities use of contract pharmacies"); *Novartis Pharms. Corp. v. Bailey,* 2025 WL 489881, at *4 (W.D. Mo. Feb. 13, 2025) (same).

AbbVie urges the Court that it at least should not follow the Eighth Circuit's resolution of this issue in *McClain* because it "was decided before HHS issued its ADR rule, and the Eighth Circuit therefore never had an opportunity to address the arguments at issue here."  (ECF No. 109 at 18 n.2.)  But the Fifth Circuit has considered and rejected AbbVie's arguments regarding the purported conflict between the Act and the federal ADR process.  In *Murrill,* AbbVie similarly argued that the Louisiana law "forces 'Louisiana courts to answer the same questions as federal ADR panels,'" inasmuch as the federal ADR scheme "covers claims 'by a covered entity . . . that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price.'"  166 F.4th at 541 n.57 (quoting 42 C.F.R. § 10.21(a)(1)).  (*Cf.* ECF No. 109 at 17 (same).)  The Fifth Circuit disagreed.  It reasoned: "[The Louisiana statute] provides the mechanism by which Louisiana can enforce the *delivery of* the 340B drugs to the contract pharmacies.  By contrast, the federal scheme allows HHS to enforce covered entities' *ability to purchase* 340B drugs.  These are

distinct matters." *Murrill,* 166 F.4th at 541 n.57 (emphasis in original). The Court adopts the same reasoning with respect to SB25-71.

For these reasons, the Court finds that AbbVie has failed to plausibly allege a preemption claim based on any alleged overlap between the Act's enforcement scheme and Section 340B's enforcement scheme.

b.     *Claims-Data Prohibition*

Second, AbbVie asserts that the Act conflicts with Section 340B "by barring manufacturers from requiring claims data as a condition of their 340B offers." (ECF No. 109 at 18.) *See* § 6-29-105(1)(b).

AbbVie alleges that, "[t]o access the federal ADR process, the 340B statute requires that a manufacturer first 'conduct an audit of a covered entity . . . as a prerequisite to initiating [ADR] proceedings against a covered entity.'" (ECF No. 43 at ¶ 157 (quoting 42 U.S.C. § 256b(d)(3)(B)(iv)).) "And before a manufacturer can conduct an audit," AbbVie continues, "it must have 'reasonable cause' to suspect a violation of the 340B statute—which requires access to claims data." (*Id.*) It thus argues that, "[b]y preventing manufacturers from requiring claims data, S.B. 71 effectively forecloses manufacturers' only avenue to pursue claims against covered entities for violations of the 340B Program's requirements." (ECF No. 109 at 19.)

It is true that Section 340B requires covered entities to permit HHS "and the manufacturer of a covered outpatient drug" to audit "the records of the entity that directly pertain to the entity's compliance with" Section 340B's prohibition on duplicate discounts and diversion. 42 U.S.C. § 256b(a)(5)(A)–(C). Any such audit, however, must be

conducted "in accordance with procedures established by [HHS] relating to the number, duration, and scope of audits."  42 U.S.C. § 256b(a)(5)(C).

In accordance with the foregoing provisions, the Act carves out an express exception to its claims-data prohibition that permits manufacturers to obtain data related to audits conducted pursuant to HHS procedures.  Specifically, the Act states that it

> *does not prohibit* a manufacturer from requiring health information or other data that a covered entity is required to furnish to the manufacturer under applicable federal law, *including data related to an audit in accordance with procedures established by the Federal Department of Health and Human Services under 42 U.S.C. sec. 256b(a)(5)(C).*

§ 6-29-105(5) (emphases added).

AbbVie has not plausibly alleged facts demonstrating that, notwithstanding this provision, the Act inhibits its access to Section 340B's prescribed audit procedures.  *Cf. Skrmetti,* 2026 WL 542712, at *11 (at dismissal stage, rejecting AbbVie's argument that Tennessee's claims-data prohibition posed a conflict with federal law when the state law excepted data "explicitly required" by federal or state law); *Skrmetti,* 2026 WL 803261, at *13 (reasoning Tennessee's law "is consistent with federal law, insofar as it simply prohibits manufacturers from requiring more data than is expressly required by federal law").

c.    *Balance of Interests*

Third, AbbVie argues that the Act "frustrates Congress's judgment by expanding the 340B Program's burden on manufacturers."  (ECF No. 109 at 20.)  It contends that, "[i]n crafting 340B, Congress struck a careful balance between multiple competing interests"—namely, "ensur[ing] that certain healthcare providers could obtain below-

14

market prices on drugs" while also "incentiviz[ing] drug manufacturers to participate in

the ostensibly voluntary Program."  (*Id*.)  According to AbbVie, Colorado has now

"skew[ed] that balance" by "increasing the cost of participating in the 340B Program."

(*Id.*)

AbbVie does not direct the Court to specific allegations in the FAC that support

this contention.  In any case, it is unpersuaded.

The Fifth Circuit recently addressed a similar argument in *Murrill:*

> AstraZeneca [] argues that even if [Lousiana's law] does not
> regulate pricing, it nevertheless "'skews' the program's
> 'delicate balance of statutory objectives'" because
> [Louisiana's law] applies only to 340B participants.  "As with
> any piece of legislation, Congress did indeed seek to strike a
> balance among a variety of interests" in enacting the Section
> 340B Program.  *See Chamber of Com. of U.S. v. Whiting*,
> 563 U.S. 582, 606–07 (2011) (plurality op.).  But "[p]art of
> that balance . . . involved allocating authority between the
> Federal Government and the States."  *Id.*  Congress decided
> not to undertake regulation of the delivery of 340B drugs or
> the role of pharmacies in that process—thereby leaving,
> absent congressional amendment, those matters to state
> law.
>
> [Louisiana's law] operates comfortably within that space.
> The statute does not disturb the federally regulated
> relationship between manufacturers and covered entities.
> Manufacturers must still offer covered entities the 340B
> ceiling price, exactly as federal law requires.  [Louisiana's
> law] comes into play only after a covered entity has
> purchased the drugs and directs their delivery to a contract
> pharmacy.  Far from frustrating § 340B's objectives, the two
> laws work in tandem to advance Congress's central aim:
> ensuring that "manufacturers participating in Medicaid ...
> offer discounted drugs to covered entities, dominantly, local
> facilities that provide medical care for the poor."  *Astra*, 563
> U.S. at 115.

166 F.4th at 542.

For the same reasons articulated by the Fifth Circuit, the Court finds that AbbVie has failed to plausibly allege that the Act is conflict preempted insofar as it "frustrates Congress's judgment."[4]

### d.     Drug Pricing

Lastly, AbbVie argues that the Act conflicts with Section 340B because, like Section 340B, it regulates drug pricing.  (ECF No. 109 at 21.)  The Court rejected this argument in the PI Order, and it does so again on the same grounds.

The Act prohibits manufacturers from "limit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, . . . a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs."  § 6-29-105(1)(a).  This prohibition, AbbVie argues, "forces [it] to make *additional sales at the 340B discount* price that the federal statute does not require and that would never otherwise occur."  (ECF No. 109 at 21 (emphasis in original).)  For the same reason, AbbVie contends the Act is "a *pricing* regulation."  (*Id.*)

As the Fifth Circuit has most recently explained, however—and this time at the summary judgment phase—the argument that state laws like the Act "must regulate

---

[4] Notably, another district court in this Circuit found that AbbVie *had* adequately alleged a Supremacy Clause violation where it similarly argued that Utah's comparable statute "obstructs the full purpose of Congress in the 340B Program . . . [by] compel[ling] manufacturers to provide discounts to certain, government-approved providers while not making the Program so onerous that it forces manufacturers to withdraw."  *AbbVie, Inc. v. Brown,* 809 F. Supp. 3d 1341, 1359 (D. Utah 2025).  Importantly, however, Utah's law differs from the Act in a critical respect: "under [Utah's law], a '340B entity' is not equivalent to 'covered entities' as defined in the 340B statute."  *Id.* at 1360.  Accordingly, the Utah district reasoned that Utah's law *did* "meaningfully expand[] the scope of entities entitled to 340B discounts," which it concluded was "directly contrary to the 340B Program's purpose."  *Id.*  By contrast, the Act defines a "340B covered entity" or "covered entity" as synonymous with "the meaning set forth in Section 340B(a)(4) . . . ."  § 6-29-103(1).

16

pricing because a *violation* would occur whenever a manufacturer attempts to sell a § 340B drug at full price rather than the discounted price" reflects "circular reasoning." *Murrill,* 166 F.4th at 541 (emphasis in original). But the Act "does not regulate prices; it regulates conduct." *Id.* at 541–42. "By its terms, the statute prohibits manufacturers from interfering with the 'acquisition' by—or 'delivery' to—a 'pharmacy [contracted with] a 340B [covered] entity.'" *Id.* at 542; *see also McClain,* 95 F.4th at 1145 ("[The Arkansas law] does not set or enforce discount pricing.").

District courts, too, have dismissed preemption claims predicated on manufacturers' contentions that laws like the Act impermissibly regulate drug pricing on similar grounds. *See AstraZeneca Pharms. LP v. Bailey,* 2025 WL 644285, at *2–*3 (W.D. Mo. Feb. 27, 2025) ("[S]tatutes akin to [Missouri's law] do not directly regulate the pricing of 340B drugs as regulation of pricing is determined by the federal 340B statute," nor does the Missouri law "require manufacturers to give the 340B discount to contract pharmacies."); *Bailey,* 2025 WL 644281, at *3–*4 ("[Missouri's law] does not require manufacturers to extend the federal 340B discount to contract pharmacies, it just restricts pharmaceutical companies from infringing on the distribution and delivery of 340B drugs bought by covered entities utilizing the 340B program."); *Bailey,* 2025 WL 489881, at *4 (same).

This Court, too, is persuaded by the Fifth and Eighth Circuits reasoning and accordingly finds that AbbVie fails to plausibly allege a preemption claim on the grounds that the Act is a conflicting pricing regulation.

17

2.    Field Preemption

The Court next considers AbbVie's allegations that the Act is field preempted.
Field preemption "exists where 'a framework of regulation' of a field is 'so pervasive' that
it leaves no space for state supplementation or where the federal interest is 'so
dominant' that the existence of a federal scheme can 'be assumed to preclude
enforcement of state laws on the same subject.'"  *Bradshaw,* 123 F.4th at 1173 (quoting
*Arizona,* 567 U.S. at 399).

AbbVie alleges that "[e]very element of the federal 340B program—from eligibility
and pricing to compliance and enforcement—is governed by federal law."  (ECF No. 43
at ¶ 146.)  The Court already addressed this argument at length in the PI Order, and it
need not reinvent the wheel:

> [I]t cannot be that Congress has enacted a scheme that
> governs "every detail" of the 340B Program.  *Four* federal
> Circuit Courts of Appeal now concur that Section 340B "is
> silent about delivery," *Sanofi Aventis,* 58 F.4th at 703;
> *Novartis Pharms.,* 102 F.4th at 461 ("agree[ing] entirely");
> *McClain,* 95 F.4th at 1143 (relying on *Sanofi Aventis*), and
> thus "regulates neither the distribution of drugs to patients
> nor the role of pharmacies in this distribution," *Fitch,* 152
> F.4th at 646.  The Court is further inclined to think that the
> manner of distribution of 340B drugs to patients is a relevant
> "detail" of the 340B Program of which Congress is well-
> aware, given that (1) "[p]harmacies have always been an
> essential part of the 340B Program" and (2) Congress *did*
> "directly address distribution by third-party wholesalers."
> *McClain,* 95 F.4th at 1143 (citing 42 U.S.C. § 256b(a)(8));
> *see also Fitch,* 152 F.4th at 646 ("Congress 'knew how to
> impose delivery-related requirements' and regulate
> distribution, because Section 340B does authorize
> distribution of drugs by manufacturers and third-party
> wholesalers." (quoting *Sanofi Aventis,* 58 F.4th at 704)).
> That "Congress chose not regulate distribution to patients . .
> . indicat[es] that it did not intend to occupy the entire field in
> this area."  *Fitch,* 152 F.4th at 646.

(ECF No. 115 at 12–13.)

AbbVie now argues in its opposition, however, that "contrary to the State's suggestion, the 340B statute *does* address drug distribution." (ECF No. 109 at 24 (emphasis added).) AbbVie cites a provision of Section 340B concerning the use of appropriated funds to "provide for improvements in compliance by covered entities . . . in order to prevent diversion and violations of the duplicate discount provision . . . ." 42 U.S.C. § 256b(d)(2)(A). The statute specifies that one such improvement "shall include" "[t]he establishment of a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and [HHS] for purposes of facilitating the ordering, purchasing, and *delivery* of covered outpatient drugs . . . ." *Id.* § 256b(d)(2)(B)(i), (iv) (emphasis added).

But the Court agrees with Defendants that the mere mention of "delivery" in this context is insufficient to establish field preemption. (ECF No. 127 at 7.) As they note, the cited statutory provision "does not mention the method for delivering drugs to covered entities," only the establishment of a "single, universal standardized identification system" to facilitate delivery, among other things. (*Id.*)

Lastly, to the extent AbbVie now defines the relevant field as "the terms of a 340B offer," (ECF No. 109 at 24), the Court has already addressed this argument, too:

> To the extent AbbVie is arguing that the relevant field is defined more narrowly—"the terms by which manufacturers must offer discounted drugs under the 340B program"—"there would still be no field preemption." *Frey,* 2025 WL 2813787, at *8. "[B]ecause 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field." *Id.* (citing *Sanofi Aventis,* 58 F.4th at 704

19

> (observing, as to the terms of an offer, that the 340B statute
> "imposes only a price term for drug sales to covered entities,
> leaving all other terms blank")).)  Congress's intent to
> preempt the field cannot be inferred solely from the fact that
> it left certain "terms" to manufacturers' discretion.  AbbVie's
> discretion to set those terms—namely, where it is willing to
> deliver 340B drugs—is derived from Congress's silence.
> *See Novartis Pharms.,* 102 F.4th at 460 ("Section 340B is . .
> . silent about delivery conditions.")  And "Congressional
> silence will not be presumed to mandate preemption." *Paul
> v. Monts,* 906 F.3d 1468, 1475 n.8 (10th Cir. 1990) (internal
> citation and quotation marks omitted).

(ECF No. 115 at 15–16.)

In sum, given the overwhelming view of the Circuit Courts of Appeal and numerous district courts that have considered the same issue, the Court finds that AbbVie's field preemption theory fails to state a claim upon which relief can be granted. *See McClain,* 95 F.4th at 1144 (affirming summary judgment for defendants because "in enacting Section 340B, Congress did not intend to preempt the field"); *Brown,* 809 F. Supp. 3d at 1356 (rejecting AbbVie's field preemption arguments at Rule 12 stage); *Skrmetti,* 2026 WL 542712, at *10–*11 (granting motion to dismiss AbbVie's field preemption claim); *Bailey,* 2025 WL 644281, at *4–*5 (same); *Skrmetti,* 2026 WL 803261, at *10–*12 (same); *Bailey,* 2025 WL 489881, at *3–*4 (same).

*******

For the reasons set forth above, the Motion is granted with respect to AbbVie's first claim that the Act is preempted by Section 340B.  (ECF No. 43 at ¶¶ 142–65.)

C.     **Takings Clause Violation**

Defendants also move to dismiss AbbVie's third claim, in which it asserts that the Act effects an unconstitutional taking.  (ECF No. 43 at ¶¶ 174–84.)

20

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: '[N]or shall private property be taken for public use, without just compensation.'" *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147 (2021). As a general matter, a government taking may occur when the government "physically acquires private property for a public use," or where, "rather than appropriate private property for itself or a third party," the government "instead imposes regulations that restrict an owner's ability to use his own property." *Id.* at 147–48.

In the FAC, AbbVie alleges that the Act effects both unconstitutional per se taking and a regulatory taking. The Court considers each theory below.

1.     Physical Taking

As noted above, a physical taking occurs when the government "physically takes possession of property without acquiring title to it." *Id.* at 147.

AbbVie alleges that the Act effects an unconstitutional physical taking because it "appropriates AbbVie's property rights in its drugs for the private benefit of for-profit, commercial pharmacies." (ECF No. 43 at ¶ 179.) More specifically, AbbVie avers that the Act "compels sales or transfers of AbbVie's drugs at the 340B-discounted price that, in the absence of S.B. 71, would not occur," because it would otherwise refuse to sell drugs at the 340B-discounted price if a covered entity required "unlimited contract pharmacy access." (*Id.* at ¶ 180.) In this way, AbbVie alleges that the Act "expands the federal 340B program requirements" and "shifts financial burdens onto manufacturers," thereby reducing their revenue and rebate offsets, "without just compensation and with no justified public use." (*Id.* at ¶ 181.)

AbbVie's claim that the Act effects a *per se* taking fails for two reasons.  First, to the extent AbbVie maintains that SB25-71 compels it to transfer title to its drugs to for-profit contract pharmacies, (*see id.* at ¶ 179), the Court rejects this characterization.  As the Fifth Circuit explained with respect to Mississippi's analogous statute in *Fitch*:

> [The Mississippi law] does not impose on drug manufacturers a positive obligation to directly transfer or sell their drugs to anyone.  Nor does it require them to sell larger quantities of their drugs at discounted prices than Section 340B requires and thereby deprive them of sales at full market price.  Under [the Mississippi law], AbbVie still receives payment of the full discounted amounts to which it is entitled under Section 340B.  [The Mississippi law] simply imposes on drug manufacturers a negative obligation of non-interference with covered entities' arrangements with contract pharmacies, by preventing them from refusing to sell Section 340B drugs to covered entities that have arrangements with contract pharmacies and from restricting what covered entities can do with Section 340B drugs after they have purchased them.

152 F.4th at 643; *see also Murrill,* 166 F.4th at 543 (adopting the same reasoning with respect to Louisiana law on AbbVie's appeal from summary judgment).

Second, as the Court explained at length in the PI Order,

> "[a] demand for personal property" is not a taking where "it involve[s] a voluntary exchange for a government benefit." *Valancourt Books, LLC v. Garland,* 82 F.4th 1222, 1232 (D.C. Cir. 2023).  So long as "the property owner is 'aware of the conditions' of an exchange," "the conditions are 'rationally related to a legitimate Government interest,'" and "the purported 'benefit' is [not] illusory," "presenting the exchange poses no takings problem."  *Id.* (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1007 (1984)); *see also Baker County Med. Servs., Inc. v. U.S. Atty. Gen.,* 763 F.3d 1274, 1276 (11th Cir. 2014) (collecting cases "instruct[ing] that no taking occurs where a person or entity voluntarily participates in a regulated program or activity").
>
> . . .

> [Thus,] the voluntariness of the 340B program poses an obvious impediment to pharmaceutical manufacturers' Takings Clause challenges to state legislation like the Act. *See, e.g., Frey,* 2025 WL 2813787, at *14 ("Because AbbVie can choose not to participate in the 340B program, AbbVie has not demonstrated a likelihood of success on its takings claim."); *AstraZeneca Pharms. LP v. Bailey,* 2025 WL 644285, at *4 (W.D. Mo. Feb. 27, 2025) ("Plaintiff voluntarily chose to participate in a federal program, and as Eighth Circuit precedent has noted, it forecloses the possibility that the federal 340B program, or S.B. 751, results in an imposed taking of private property which would give right to the constitutional right to just compensation.").
>
> . . .
>
> Here, AbbVie does not argue that the Act purports to compel its participation in the 340B Program.  To the contrary, it has affirmed that it remains free, in its sole discretion, to withdraw from the Program.  (ECF No. 111 at 261:4–7 ("one day laws like this are going to force manufacturers to withdraw on a manufacturers to withdraw on a nationwide basis Medicare and Medicaid"); *see also* ECF No. 98 (AbbVie's notice of supplemental authority informing the Court that "a large drug manufacturer announced that it will withdraw from both 340B and Medicaid next week").)  Though that would be an unfortunate result, it appears at this juncture that AbbVie has more likely identified a public policy issue, and not a Takings Clause violation.

(ECF No. 115 at 26–27.)

At least one other district court has concluded at the Rule 12 stage that a pharmaceutical manufacturer's voluntary decision to participate in Section 340B "forecloses the possibility that the federal 340B program, or [Missouri's analogous state law], results in an imposed taking of private property which would give ri[se] to the constitutional right of just compensation."  *Bailey,* 2025 WL 644825, at*4.  This Court concurs.

AbbVie's claim that the Act effects a per se taking is accordingly dismissed.

23

2.      Regulatory Taking

In the alternative, AbbVie argues that the Act also "effectuates a partial regulatory taking."  (ECF No. 43 at ¶ 182.)

A "regulatory taking" occurs "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property."  *Hassid,* 594 U.S. at 148.  "To determine whether a use restriction effects a taking"—that is, to determine whether a regulation "goes too far" in limiting an owner's use of their property—courts apply "the flexible test developed in *Penn Central.*"  *Id.* (citing *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104 (1978)).  That test directs courts to consider three factors: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action."  *Penn Cent.,* 438 U.S. at 124.

AbbVie argues that each of the *Penn Central* factors weighs in favor of finding the Act effects a regulatory taking.  First, it contends the state law "imposes significant financial loses" on AbbVie, amounting to "tens of millions of dollars per year," and diminishes the value of the drugs it sells in Colorado to the extent it "requires AbbVie to unwillingly sell drugs to Colorado entities at penny prices."  (ECF No. 109 at 29–30 (citing ECF No. 43 at ¶ 38, 137, 184).)  But even to the extent that the Act "could increase the number of drugs for which [AbbVie] must provide discounts . . . for most drugs, AbbVie will still receive a large percentage of the market price."  *Murrill,* 166 F.4th at 543–44 (citations omitted).  Moreover, "mere diminution in the value of property . . . is insufficient to demonstrate a taking."  *Concrete Pipe & Prods. of Cal., Inc. v.*

*Constr. Laborers Pension Tr. for S. Cal.,* 508 U.S. 602, 645 (1993). Thus, the first factor cuts against AbbVie.

Second, AbbVie argues the Act interferes with its reasonable investment-backed expectations because "[t]he 340B Program ran for nearly two decades on guidance that covered entities could use only a single contract pharmacy, and manufacturers like AbbVie relied on that backdrop." (ECF No. 109 at 30.) However, reasonable, investment-backed expectations require more than a "unilateral expectation or an abstract need." *Monsanto,* 467 U.S. at 1005. AbbVie's assertion that the Act is "hardly the sort of state drug regulation AbbVie should have seen coming," (ECF No. 109 at 30), is implausible considering, among other reasons, that: (1) the federal government had itself attempted in the recent past to do precisely what the Act accomplishes, (*see* ECF No. 115 at 4–6); (2) the 340B program is silent about delivery, yet "[c]ontract pharmacies have been part of the 340B landscape for decades," *Murrill,* 166 F.4th at 543–44;[5] and (3) States have traditionally had primary regulatory authority over the field of pharmacy, *McClain,* 95 F.4th at 1143. The second factor weighs against AbbVie.

Third, AbbVie contends the character of the governmental action weighs in its favor because it "has plausibly alleged that S.B. 71 provides no benefit to needy patients and communities, and that it fails to improve charity care or healthcare." (ECF No. 109 at 30 (citing ECF No. 43 at ¶¶ 71–78, 140).) To the contrary, AbbVie contends that the Act "creates an extra source of revenue for Colorado pharmacies and the

---

[5] *See also Palazzolo v. Rhode Island,* 533 U.S. 606, 633 (2001) (expectation's reasonableness is shaped by "the regulatory regime in place at the time the claimant acquires the property").

25

hospital systems they contract with . . . at the manufacturer's expense." (ECF No. 109 at 30 (citation omitted)). But the Act "does not create any new obligation outside of the federal 340B program except with regard to delivery and acquisition of 340B drugs to contract pharmacies." *Bailey,* 2025 WL 644285, at *6. More specifically, as Defendants submit, "it does not create any new price or covered entity beyond what 340B already requires." (ECF No. 127 at 15.)

Thus, the character of the government action at issue here does not suggest a physical taking but instead an effort to "adjust[] the benefits and burdens of economic life to promote the common good," *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 539 (2005) (citation omitted), by "ensur[ing] delivery of 340B drugs to covered entities and contract pharmacies," so they can aid in the dissemination of those drugs "to the patients who are qualified through the *federal* 340B program," *Bailey,* 2025 WL 644285, at *6. To the extent AbbVie believes *Section 340B* inadequately accomplishes its objective to "promote the common good" by "ensur[ing] that uninsured and low-income individuals can access the medications they need and to ensure that medical providers serving those individuals receive crucial subsidies," *Fitch,* 152 F.4th at 639, its complaints are misdirected.

For these reasons, the Court concludes that AbbVie also fails to plausibly allege that the Act effects a regulatory taking. *Cf. Bailey,* 2025 WL 644285, at *6.

*******

For the reasons set forth above, the Motion is granted with respect to AbbVie's claim that the Act violates the Takings Clause.

## V.      LEAVE TO AMEND

AbbVie does not seek leave to further amend its FAC in its response to the

Motion.  (*See generally* ECF No. 109.)  Moreover, under Tenth Circuit precedent,

dismissal without leave to amend is appropriate if "it would be futile to allow the plaintiff

an opportunity to amend."  *Brereton,* 434 F.3d at 1219.  The Court finds that AbbVie

cannot allege additional facts that would overcome the reasoning underpinning the

Court's dismissal of AbbVie's first and third claims for relief.  For the same reason,

amendment of those claims would be futile under the circumstances.  AbbVie's first and

third claims will accordingly be dismissed with prejudice.  *See id.*

## VI.      CONCLUSION

For all the foregoing reasons, the Court ORDERS as follows:

1.      Defendants' Motion to Dismiss (ECF No. 81) is GRANTED;

2.      Plaintiffs' Second Claim for Relief is DIMISSED without prejudice for lack

of standing;

3.      Plaintiffs' First and Third Claims for Relief are DISMISSED with prejudice

for failure to state a claim;

4.      The Clerk of Court shall enter judgment in favor of Defendants and against

Plaintiff;

5.      As the prevailing parties, Defendants are entitled to their costs pursuant to

Fed. R. Civ. P. 54(d)(1), *see Burton v. Vectrus Sys. Corp.,* 834 F. App'x 444 (10th Cir.

2020); and

6.      The Clerk of Court is DIRECTED to terminate this action.

27

Dated this 10th day of June, 2026.

BY THE COURT:

William J. Martinez
Senior United States District Judge